Bonnie BECKHAM et al., Appellants,

v.

EXXON CORPORATION, Appellee.

No. 16672.

Court of Civil Appeals of Texas, Houston (1st Dist.).

July 22, 1976.

Rehearing Denied Aug. 19, 1976.

Brock, Williams & Boyd, Gerald J. Goodwin, Houston, for appellant.

Charles Matthews, Lauren Eaton, Houston, for appellee.

COLEMAN, Chief Justice.

This is an appeal from a summary judgment granted the defendant, Exxon Corporation in a case growing out of an automobile collision between a wrecker driven by Robert Wilder, an employee of Joe Cunningham, who operated an Exxon Service Station. The issue is the existence of a master/servant relationship between Exxon and Joe Cunningham. We find no evidence raising an issue of fact and affirm the judgment of the trial court.

Exxon has the burden of establishing by affirmative evidence that there are no material issues of fact. *Farley v. Prudential Insurance Co.,* 480 S.W.2d 176 (Tex. 1974). The court will be guided by this principle of law in reviewing the evidence.

Guidelines for evaluating the relationship between Exxon and Cunningham are provided by the Supreme Court in *Texas Co. v. Wheat,* 140 Tex. 468, 168 S.W.2d 632 (1943), and *Humble Oil & Refining Co. v. Martin,* 148 Tex. 175, 222 S.W.2d 995. In *Wheat* the court stated:

"Whether or not the relation of master and servant existed between the Texas

Company and Gossen so as to make the doctrine of respondeat superior applicable, depends upon whether the Texas Company has the right to control Gossen in the details of the work to be performed in the operation of the service station . . . ."

It appears that the court first examined the contracts between the parties to determine whether or not Texaco had a contractual right to control Gossen in the details of the work to be performed in the service station and then examined the evidence to determine whether or not Texaco in fact controlled Gossen and his employees in the details of the work performed in the operation of that station.

Joe Cunningham testified that he was 25 years old, a high school graduate, and that he had received some additional educational training while in the job corps. At one time he operated a Texaco service station, but he didn't have enough money to make a go of it. He lost money and had to turn it back to Texaco. He found other employment and saved a sum of money which he considered sufficient to again go into the filling station business. He applied to Humble Oil Company for a station and found that he was required to attend a training school. He entered the training school and on completion of the course was assigned a station. At first he was the salaried manager of the station. While attending the training course he was given three books, one of which is entitled "Retail Store Operating Procedures Manager Humble Oil & Refining Company." It contains detailed instructions concerning the methods to be used in operating the filling station. He was also given a book entitled "Retail Store Operating Procedures. Accounting." The third book with which he was furnished was entitled "Service Station Management." Mr. Cunningham was required to familiarize himself with the contents of these books while in the training school. Subsequently while he was employed by Humble he was required to operate the station in accordance with the directions contained in these books. He testified that after he served as a manager for several months, the relationship changed, and he became a dealer.

When Mr. Cunningham became a dealer he entered into two contracts with Humble Oil & Refining Company, one entitled "Sales Agreement" and another entitled "Lease to Dealer." The lease concerned the same filling station which he had previously managed located at the intersection of North Freeway and Little York Road. It was for a period of three years and contained a provision authorizing the lessee to terminate at any time by giving Humble thirty days' prior written notice and authorized Humble to terminate the lease during the first year by giving lessee thirty days' prior written notice. The lease provided for a basic rental of 1½ cents on each gallon of gasoline and motor fuel delivered plus $75.00 per month for the use of the "third bay." The rental was payable on delivery of the gasoline and motor fuel to the lessee's storage tanks. It included a provision for a rental adjustment in favor of the lessee based on the amount of gasoline sold above a certain "base gallonage". The lease contained various provisions usual to a real estate rental contract including covenants to make no unlawful or offensive use of the premises, to keep the premises in a clean and orderly condition, to pay the rent on time, to make no assignment of the lease, to make no additions or alterations to the structure of the building without written permission of the lessor, and "to make at Lessee's expense all repairs to the premises and equipment caused by the neglect, misuse or carelessness of Lessee and Lessee's employees." The lessee agreed "to use the premises as a drive-in gasoline station only, and to keep such station open for such purpose 24 hours each day." It is of some significance that the lease provided:

"No obligation is imposed on the Lessee by the terms of this lease for real estate and personal property taxes and assessments on the premises herein demised, but Lessee agrees to pay personal property taxes on Lessee's property and all other taxes, license fees, assessments and charges levied against and necessary for

the operation of Lessee's business on said premises, including charges for sewer rent or service, water, telephone, gas and electric current consumed on said premises and any other services that may be furnished said premises."

The sales agreement was for a period one year and for year-to-year thereafter, subject to the right of either party to terminate the same at the end of the first contract year or any subsequent contract year by giving to the other party thirty days' advance written notice of termination. Cunningham was required to purchase a certain minimum amount of gasoline and motor oil and Humble was required to sell and deliver to Cunningham gasoline and motor oil up to a stated maximum amount. Cunningham agreed to pay for said products the established dealer price in cash on delivery. Paragraph 8 of the contract provides:

"All orders for products hereunder will be filled with reasonable promptness by Seller; but it is agreed that Seller shall not be liable in damages or otherwise for delay or failure to make deliveries when such delay or failure is due to any cause whatsoever beyond the control of Seller."

The buyer agreed that "petroleum products received from others will not be sold by Buyer under any trade name, trademark, brand name, label, insignia, symbol, or imprint owned by Seller or used by Seller in its business . . . Buyer shall not mix, commingle, adulterate, or otherwise change the composition of any of the products purchased hereunder and resold by Buyer under said names, marks, labels, insignia, symbols, or imprints."

In *Wheat,* supra, the Supreme Court said:

"The contract between the company and Gossen on its face, as evidenced by the written instruments, created the relation of landlord and tenant, and not the relation of master and servant, and we find nothing in the evidence to indicate that the contract, as written, was intended as a subterfuge or sham to conceal the existence of a different relationship. The fact that Gossen paid rent, bought and paid for the merchandise, bore all the expenses of operating the station, employed and controlled the employees in the discharge of their work, stood the losses and appropriated the profits is consistent with the relationship of landlord and tenant, and inconsistent with that of master and servant."

There is nothing in the lease agreement inconsistent with the relationship of landlord and tenant. It is true that there is a provision requiring the lessee to keep the station open 24 hours each day. The company, as lessor, was interested in selling a maximum amount of its product, and it had a right, as a condition precedent to the leasing of the station, to demand a maximum use of the facility leased.

There is nothing in the sales agreement giving Humble the right to control Cunningham in the details of the work involved in the operation of the service station. Humble has the right to protect its trademarks and good will. The sales agreement does not prohibit Cunningham from selling products other than those manufactured or furnished by Humble, but it does effectively prohibit Cunningham from representing such products as being Humble products.

Next we examine the testimony found in the depositions to determine whether the contracts were intended as a subterfuge or sham to conceal the existence of a different relationship, and to determine whether in fact Humble (now Exxon) controlled Cunningham in the details of the work performed in the operation of the service station. The plaintiff points to the manuals furnished to Cunningham while he attended Humble's training school, which contained detailed instructions as to the proper manner in which to operate a filling station. Cunningham testified that he was required to follow these instructions while he was a salaried manager of the station, but that he no longer is required to follow these instructions, and that in some instances he does not follow them. Cunningham also testified that while the station is inspected at periodic intervals, and that a report of the result of the inspection is furnished

him, he is not required to comply with the recommendations made by Exxon. Exxon sets the price at which it sells its products to the dealers, and recommends a retail price. Cunningham testified that he set his own prices. He also testified that he was the "boss" at the service station and directed the day-to-day operations there. He testified that he bought and paid for the Exxon products which he sold, and that he sold products manufactured by other companies from time to time. He testified that his profit on the sale of gasoline might pay his expenses, but that he had to depend on other activities for his principal income. He owns all the appliances and tools at the station other than the car lift and drinking fountain, and he engages in automobile repair work, tire changing, and operates in a limited way a wrecker service. He testified that he purchased the wrecker and retains all of the fees collected for its use. Exxon had never inspected the wrecker. He pays the expense of all of the activities engaged in at the station and retains all of the profit generated. Exxon does not share in the profits or losses of the station, or bear any of the expenses incurred in its operation. He recognizes that if Exxon does not approve of the manner in which he operates the station his lease might not be extended on its expiration period.

There is no evidence that Exxon had ever undertaken to exercise control of the methods used by Cunningham in the operation of his wrecker business, the activity out of which this injury grew. Exxon did not select the driver of the wrecker, authorize or forbid the use of the leased premises for such purpose or make any suggestions regarding the operation of such business.

The plaintiff relies on *Humble Oil & Refining Co. v. Martin,* 148 Tex. 175, 222 S.W.2d 995 (1949). It is clearly distinguishable on the facts. There the contract between the parties includes a provision requiring the operator of the station "to make reports and perform other duties in connection with the operation of said station that may be required of him from time to time by Company." Humble paid part of the operational expense. Title to the oil and gas remained in Humble until delivery to the consumer.

The facts of the instant case establish as a matter of law a landlord-tenant relationship between Cunningham and Exxon and that in the operation of the service station Cunningham was an independent business man under a contractual relationship with Humble. This contractual relationship does not give Humble the right to control the details involved in operating the service station. The evidence establishes that Humble did not in fact control Cunningham's operations. There is no competent summary judgment evidence to the contrary. The trial court did not err in granting the summary judgment. *Texas Company v. Wheat,* supra; *Frye v. Sinclair Oil & Gas Co.,* 249 S.W.2d 102 (Tex.Civ.App.-Fort Worth, 1952, writ ref'd); *McGee v. Phillips Petroleum Company,* 373 S.W.2d 773 (Tex.Civ.App.-El Paso, 1963, writ ref'd n.r.e.); *Mid-Continent Freight Lines, Inc. v. Carter Publications, Inc.,* 336 S.W.2d 885 (Tex.Civ.App.-Fort Worth, 1960, writ ref'd).

Affirmed.